Filed 7/21/14  P. v. Diaz CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055382 |
| v. | (Super.Ct.No. FSB1002903) |
| CARLOS DIAZ et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Harold T. Wilson, Jr., Judge.  Affirmed with directions.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant Carlos Diaz.

Randi D. Covin, under appointment by the Court of Appeal, for Defendant and Appellant Roberto Figueroa.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel, Eric A. Swenson and Jennifer Truong, Deputy Attorneys General, for Plaintiff and Respondent.

This case involves two defendants, Carlos Diaz (Diaz) and Roberto Figueroa (Figueroa) (collectively "defendants"). Defendants had separate juries at a single trial. The juries found defendants guilty of first degree murder. (Pen. Code, § 187, subd. (a).)[1] The juries found true the allegations that defendants (1) committed the murder to benefit a criminal street gang (§ 186.22, subd. (b)(1)(C)); and (2) during the murder defendants discharged a firearm causing death—principal as to Diaz and vicarious as to Figueroa (§ 12022.53, subd. (d)). Diaz's jury also found true the allegations that Diaz (1) discharged a firearm during the murder (§ 12022.53, subd. (c));[2] and (2) used a firearm during the murder (§ 12022.53, subd. (b)). At the time of the murder, Diaz was 15 years old and Figueroa was an adult. The trial court sentenced defendants to prison for indeterminate terms of 50 years to life.[3]

Figueroa raises five issues on appeal. First, Figueroa asserts the trial court erred by denying his motion to suppress statements made to police officers. Second, Figueroa contends the trial court erred by not instructing the jury that accomplice testimony should be viewed with caution. Third, Figueroa asserts the cumulative error violated his right of due process. Fourth, Figueroa contends the trial court erred by imposing a 10-

---

[1] All subsequent statutory references will be to the Penal Code unless otherwise indicated.

[2] There is conflicting information in the record concerning whether Figueroa also suffered a true finding on a section 12022.53, subdivision (c), firearm enhancement. We address the inconsistency *post*.

[3] The trial court ordered that Diaz be housed at juvenile hall until his 18th birthday, when he would be sent to prison.

year sentence for the gang enhancement (§ 186.22, subd. (b)(1)(C)), rather than a minimum parole date. The People agree with Figueroa's fourth contention. Fifth, Figueroa contends his prison sentence constitutes cruel and unusual punishment. We (1) strike the prison term for Figueroa's gang enhancement and impose a minimum parole eligibility date, and (2) provide directions related to the section 12022.53, subdivision (c) firearm enhancement, but otherwise affirm the judgment in Figueroa's case.

Diaz raises three issues on appeal. First, Diaz contends the trial court erred by admitting statements Diaz made following an involuntary *Miranda*[4] waiver. Second, Diaz asserts his 50-years-to-life sentence constitutes cruel and unusual punishment due to his age at the time he murdered the victim. Third, Diaz asserts the trial court erred by imposing a determinate prison term for the gang enhancement, rather than a minimum parole date. (§ 186.22, subd. (b)(1)(C).) The People agree with Diaz's third contention. We will strike the 10-year gang enhancement sentence and impose a 15-year minimum parole eligibility provision for the gang enhancement (§ 186.22, subd. (b)), but otherwise affirm the judgment in Diaz's case.

## FACTUAL AND PROCEDURAL HISTORY

Figueroa was a member of the West Side Verdugo gang, which is based in San Bernardino. Diaz was a member of the South Los Gangsters gang, based in Los Angeles. Diaz moved from Los Angeles to Highland. If Diaz committed a murder in

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

3

the San Bernardino area, witnessed by a West Side Verdugo member, then Diaz would be permitted to become a member of West Side Verdugo.

A woman, Cinasha Rojas (Rojas), was an associate of the West Side Verdugo gang. Rojas had known Figueroa for approximately four years and had known Diaz for approximately one year. The victim, who was male, was a member of the Rollin' Twenties Crips gang, which is based in Long Beach.

On July 12, 2010, Figueroa visited Rojas's house. Figueroa had a sawed-off rifle or shotgun in his backpack, which he was planning to sell. Figueroa also had ammunition with yellow casings. Figueroa left Rojas's house, but returned that evening with the same backpack. Rojas, Figueroa, and two other people decided to go to a liquor store. Rojas and one of the unidentified people rode bicycles to the store, while Figueroa and the fourth person walked. Figueroa and the fourth person were approximately one and a half blocks behind Rojas.

On the way to the store, Rojas saw the victim with two other people. Rojas said, "'Hey.'" The victim asked, "'What do you want?'" Rojas asked, "'Where are you from?'" The victim said he was "from Rolling Twenty Crip[s]." Rojas responded that she was "from West Side Verdugo." The victim said, "'Who cares?'" and pushed Rojas's chest, knocking her over along with her bicycle. Rojas "got back up, picked up her bike, and said, 'Oh, we'll see.'" Rojas rode away. The victim walked to his parents' house, which was located in Highland.

Rojas rode her bicycle toward Figueroa, who at that point had been joined by Diaz. Rojas told Figueroa and Diaz about her encounter with the victim. Figueroa said

4

he wanted to fight the victim, but Rojas said the victim had a gun, so Figueroa walked Rojas home and retrieved his backpack, which he had left at her house.

At the victim's parents' house, the victim and his girlfriend sat outside, in the front yard, talking to one another while the victim smoked cigarettes. A "couple of boys" walked by the house. After approximately 30 minutes, the victim asked his girlfriend to "warm up the car." The victim walked toward a gate, but did not open it. The victim instructed his girlfriend to go inside the house and get the victim's brothers. While the victim's girlfriend was inside the house, she heard two gunshots.

The victim's girlfriend saw the victim on the ground, behind the gate. The victim's sister called 911. The victim suffered two shotgun wounds—one in the right side of his chest and one in the left temple. The shot to the temple was fatal.

Rojas noticed she missed a call that came from Diaz's mother's telephone. Rojas returned the call and Figueroa answered. Figueroa said, "[I]t's taken care of." Figueroa laughed, and it sounded like Diaz may have also been laughing. Rojas assumed "they seen [the victim] again and beat him up or something." Two expended yellow shotgun shells were found near the victim's feet. No firearms were found on the victim's body or at his parents' house. When searching Diaz's bedroom, police found a yellow unfired shotgun shell.

During a police interview, Diaz admitted shooting the victim. Diaz said, "I shot him." Diaz explained that he and Figueroa stood on a corner arguing over who would shoot the victim because they both wanted to be the shooter, but Diaz prevailed. Diaz approached the victim, and said, "[W]asn't you the one that used to put the burner on,

5

on the homies earlier?" The victim replied, "[O]h yeah, that was me, why, what's up?" Diaz removed the gun from his waistband. The victim looked at Diaz with an expression reflecting, "[W]hat the hell are you doing?" Diaz shot the victim. Diaz was less than three feet away from the victim when he shot the gun. The victim collapsed. Diaz shot the victim a second time because he wanted to ensure the victim would not be a witness. Figueroa took the gun from Diaz.

A police detective asked Diaz, "How do you feel about knowin[g] that guy's dead?" Diaz responded, "You mean, honestly, [what] happened, happened, ya know, what can I do?" The detective asked if Diaz felt sorry. Diaz asked, "What for?"

Figueroa was interviewed by San Bernardino County Sheriff's Detectives Scott Cannon (Cannon) and Dave Johnson (Johnson). Figueroa admitted giving Diaz the gun and 10 or 11 shells with yellow casings. Figueroa said he thought Diaz planned to use the gun to scare the victim, but he was worried Diaz might do more. Figueroa was present during the shooting. Figueroa heard the victim say to Diaz, "[N]o disrespect," at which point, Diaz shot the victim. Figueroa and Diaz ran away after the shots were fired.

## DISCUSSION

A.     FIGUEROA

     1.     *MOTION TO SUPPRESS*

     a)     Procedural History

     i.     *Interview*

Figueroa's interview with Cannon and Johnson began on July 13 at 7:45 p.m. Cannon said he appreciated Figueroa "coming down to talk with" the detectives. Cannon explained the door to the room was unlocked, but closed due to noise outside the room. Figueroa said he was "fine with that." Cannon asked if Figueroa was willing to talk, and Figueroa said he was willing.

Cannon asked Figueroa about the day of the murder. Figueroa said he smoked marijuana, went running, and visited family and friends. Cannon asked if Figueroa had heard about "anything . . . that went down" in the neighborhood the night of the murder. Figueroa said he had not heard of anything. Cannon told Figueroa a person was fatally shot in the neighborhood. Cannon asked if Figueroa might know who was responsible for the murder. Figueroa said he did not know. Cannon asked if Figueroa would ever be capable of shooting another person. Figueroa said he would walk away if he were in a fight—he would not shoot a person. Cannon asked if a person would be lying if a person said he saw Figueroa walking down the street where the victim was killed on the night of the shooting. Figueroa said the person would be lying.

Cannon told Figueroa he appreciated Figueroa coming to the station and talking to the detectives. Cannon asked Figueroa if he would take a polygraph test. Figueroa

7

agreed to take the test.  The interview continued while a polygraph examiner was located; Figueroa discussed his past arrests, and engaged in small talk, then the interview was interrupted to allow for the polygraph exam.  Afterward, Cannon began the "post poly[graph] interview" by saying, "Alright so basically here we are again um door still unlocked ok, we keep it closed just for the noise level.  Um once again we really do appreciate you coming down and speaking with us.  Um you're still willing to talk to us for a little while longer?"  Figueroa responded, "Yeahh yeahh."

Cannon again asked Figueroa about the day of the murder.  Cannon told Figueroa that he knew Figueroa was lying about not having information regarding the shooting. Figueroa admitted seeing "shots go off," but then said he only heard the gunfire. Cannon accused Figueroa of lying when he switched his story to only hearing gunfire— not seeing it.  Figueroa said, "I'll be killed."  Cannon responded, "No[,] you're not gonna be killed."  Figueroa admitted to being in "the vicinity" at the time of the shooting.

Cannon asked Figueroa to describe what he saw.  Figueroa said he saw "the flashes" from "around the corner."  Figueroa expressed concern that he would be killed for talking to the detectives.  Cannon told Figueroa not to be worried about repercussions from Westside Verdugo members, because there would be "bigger problems" if he lied to the detectives.  Cannon told Figueroa he knew (1) Figueroa was at the scene of the shooting, (2) Figueroa had a gun, (3) there was a confrontation, (4) the victim died, and (5) Figueroa did not appear to be injured.  Cannon told Figueroa he was trying to make sense of the foregoing evidence—trying to understand the reason

8

for the shooting.  Cannon said, "So if you wanna continue and understand that I've got evidence that clearly links you to this shooting . . . [¶] . . . [¶] . . . it's only gonna look worse for you when we go forward and we present this to the district attorney's office." Figueroa responded, "Yeahh it is."

As the interview continued, the following exchange took place

"Cannon:  So you make little mistakes ok like that you say what happened when you wanted to say I heard, you said I saw, I know you saw it ok.  I know you were there.  I know that you played a rol[e] in this ok[.  W]hat we need to understand is what was your rol[e], why did it happen, how did it happen, ok these things are all important."

"Figueroa:  Plead the 5th.

"Cannon:  Well that's that's unfortunate if you wanna go that route.

"Figueroa:  Yes it is but I'll be killed anyways.

"Cannon:  Well you're not gonna be killed Roberto.  Like I said lets put the drama where it belongs in this room.

"Figueroa:  (Inaudible) and I know I will.

"Cannon:  Roberto who did you hear that from?

"Figueroa:  I'm not a rat sir."

Shortly thereafter, as the interview continued, the following discussion occurred:

"Cannon:  Ok I'm not telling you to admit [to] anything you didn't do.  Do you know what a, do you know what a photographic lineup is?  What is that?

"Figueroa: When um when a photo like they put the photos down and you have to circle pictures.

"Cannon: Ok.

"Figueroa: Yeah.

"Cannon: Ok do you know that we have a photographic lineup that we showed to 3 different people and two of the people were absolutely sure that you were there and one was about 75% sure you were there at the scene when this went down? Roberto sit up, wake up ok. It's not time to sleep it's time to confront.

"Figueroa: [W]e been at this a long time now.

Cannon: I understand it's time to confront what's going on ok. Confront it head on ok."

Figueroa denied killing the victim. Cannon informed Figueroa that deputies were serving a search warrant at Figueroa's house and finding "[e]vidence that links [Figueroa] to this crime." Figueroa again denied shooting the victim. Cannon asked Figueroa to supply details regarding the shooting. Figueroa said, "It's not like I'm gonna get outta here so . . . . [¶] . . . [¶] I understand where you guys are comin[g] from but there's no way now that you guys can help me so what does it matter?" As the interview continued, the following discussion occurred:

"Cannon: By what you're saying is that you're not responsible.

"Figueroa: I know I'm not.

"Cannon: For this guy being dead.

"Figueroa: I know I'm not, I know I'm not, I know this . . . . man I know this and I know this, I know this.

"Cannon: Well how does the evidence from the scene get to your house then? If you're not responsible how does the evidence from the scene get to your house? Tell me that.

"Figueroa: I don't know.

"Cannon: You don't know! Is the guy who is responsible for it and you're not naming names but the guy who's responsible did he make it?

"Figueroa: Exactly.

"Cannon: To your house and leave the evidence at your house from the scene?

"Figueroa: No.

"Cannon: No, then how did the evidence that we found at the scene, same similar stuff get to your house, how's that happen?

"Figueroa: I think I've talked enough.

"Cannon: Who's Jaba?

"Figueroa: Jaba?"

As the interview continued, Figueroa again denied shooting the victim, but refused to identify the shooter due to his fear of being a "snitch." Johnson interjected into the conversation. Johnson said, "Roberto do me a favor. Do you mind if I have a couple more minutes of your time bro?" Figueroa responded, "Yeah yeah yeah." Johnson asked Figueroa to describe the flashes he saw at the time of the shooting.

11

Figueroa said he did not want to make a statement about what he saw because he feared for his life.

Figueroa said, "I'm gonna get locked up for something that I didn't do." Johnson responded, "Hang on dude[.] I don't know what you're gonna tell me ok. I'm trying to give you an opportunity that that that doors unlocked that doors open ok. We've we've talked about that several times ok. I want to hear your story dude. I'm trying to give you an opportunity because like I said it may[]be different than what I think or what I'm being told or what it looks like."

Shortly thereafter, Figueroa said, "Like I wish one day I could see my mom or something like that but I know it's not gonna happen now." Johnson responded, "No now what you need to ask yourself dude, like I told you that door's open dude." Figueroa said, "It is but it doesn't matter." Johnson told Figueroa to stop worrying about what might happen in the future. Cannon asked Figueroa to explain what happened during the shooting so Figueroa would not have to go to "prison for someone else's stupidity."

Figueroa said he heard someone say "no disrespect" before the shots were fired. Figueroa admitted he lied earlier in the interview about where he had been during the day of the murder. Johnson told Figueroa they would "wipe the slate clean," and start from the beginning. Figueroa said he was walking down the street when he saw the shooter and victim confronting one another. Figueroa heard someone say "no disrespect," two shots were fired, and Figueroa ran away. Figueroa said he "just happen[ed] to walk by at the wrong time." Figueroa denied knowing the shooter and

12

the victim. Figueroa said he could not describe the victim because after the shooting the victim "didn't have no freakin[g] head."

Johnson offered Figueroa a soda and food. Figueroa took both. Johnson told Figueroa where the restroom was located, in case he needed it. Johnson said he was trying to find pictures for Figueroa to look at. Figueroa said, "Cause that's I don't don't mind helpin you guys out man ya know but." The interview stopped at 1:33 a.m., and resumed at 1:52 a.m.

When the interview resumed, Cannon informed Figueroa of his *Miranda* rights. After being informed of his rights, Figueroa asked, "[D]oes that mean I'm go[ing] to jail?" Cannon replied, "No that doesn't mean that, that just means we want to hammer some things out." The interview continued. Johnson showed Figueroa photographs. Figueroa said he had seen some of the people "around." Johnson told Figueroa it was important for him to tell his story.

Figueroa said, "[S]omebody got knocked off their bike, somebody got hurt, and the person that did this had a gun." Diaz told Figueroa the story about the altercation with Rojas and the bicycle, and Diaz told Figueroa he needed a gun. When Figueroa and Diaz were around the corner from the victim's house, Figueroa gave a gun to Diaz, along with eight to ten yellow shells in a black trash bag. Diaz then began walking away from Figueroa—Diaz "started taking off." Figueroa was behind Diaz, "like dude where you going," "what are you doing man." Diaz did not tell Figueroa what he planned to do with the gun. As Figueroa approached he heard a quick verbal confrontation, he specifically heard the words "no disrespect," and then he heard

13

gunshots. Figueroa was shocked Diaz shot the victim—Figueroa thought Diaz was just planning to scare the victim. Figueroa ran away. The interview ended at 3:12 a.m.

ii.     *Motion*

Prior to trial, Figueroa moved to suppress statements he made to Detectives Cannon and Johnson. During the interview, Figueroa said, "'Plead the 5th.'" Later during the interview, Figueroa said, "'I think I've talked enough.'" Figueroa asserted all the statements he made after saying, "'Plead the 5th,'" should be suppressed because the statement was an invocation of his right to remain silent. Figueroa further asserted his *Miranda* waiver was involuntary because the police interview began at 7:45 p.m., and he was not informed of his *Miranda* rights until 1:00 a.m. the following morning. Figueroa asserted the detectives cleverly "softened him up," resulting in an involuntary waiver.

The People asserted Figueroa was not in custody when he made the statement about pleading the Fifth, so *Miranda* rules did not apply. The People argued, "Figueroa was free to leave. Detectives told him over and over that the door was unlocked. He was not in handcuffs, he did not have guns pointed at him, and he was not under arrest at that time. Detectives asked Figueroa if he would be willing to keep talking to them and he did." In regard to statements made after the detectives informed Figueroa of his *Miranda* rights, the People asserted Figueroa's waiver was voluntary because "Figueroa continued to speak with the same detectives after being read his *Miranda* rights."

At a hearing on the motion, Figueroa's trial counsel asserted Figueroa would have reasonably felt he was in custody when he "pled the Fifth" because the interview

14

room door was closed, two detectives were in the room, and one of the detectives responded, "'[T]hat's unfortunate if you wanna go that route.'" Figueroa then said, "'Yes. It is, but I'll be killed anyways.'" Defense counsel asserted that under these circumstances, a reasonable person would believe he was in custody. Alternatively, counsel asserted that if Figueroa were not in custody when he "pled the Fifth," then he was in custody later during the interview when he said he had "'talked enough.'"

The prosecutor noted (1) the detectives asked Figueroa if he was willing to talk with them, (2) the detectives explained they were closing the door only due to the noise level, (3) the detectives informed Figueroa the door was unlocked, (4) the detectives provided Figueroa with food and water, (5) Figueroa voluntarily came to the police station, and (6) Figueroa had his bicycle so he had a means of transportation if he wanted to leave. The prosecutor asserted Figueroa was free to leave until the detectives read him his *Miranda* rights.

Defense counsel asserted a person does not have to be in custody in order to invoke the right to remain silent. Therefore, Figueroa's statements should be suppressed because, regardless of whether he was in custody, police should have stopped questioning him when he "pled the Fifth"—based upon his right to remain silent, not *Miranda*.

The trial court concluded *Miranda* only applies when a person is in custody. The trial court found Figueroa was not in custody when he "pled the Fifth" and said he had "talked enough." Accordingly, the trial court found there were no *Miranda* violations. The trial court denied Figueroa's motion to suppress.

15

b)      Analysis

Figueroa contends the trial court erred by denying his motion to suppress because (1) he invoked his *Miranda* right to remain silent; (2) he did not knowingly waive his *Miranda* rights; and (3) his statement was involuntary, which implicates his due process rights.  We address each issue in turn.

i.      *Custody*

Figueroa asserts the trial court erred by denying his suppression motion because he was in custody or at imminent risk of being taken into custody when the statements were made.  Figueroa contends the detectives should have stopped questioning him when he "pled the Fifth."

"'Absent "custodial interrogation," *Miranda* simply does not come into play.' [Citation.]" (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.)  "The question [of] whether [a] defendant was in custody for *Miranda* purposes is a mixed question of law and fact. [Citation.]  'Two discrete inquiries are essential to the determination:  first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.  Once the scene is . . . reconstructed, the court must apply an objective test to resolve "the ultimate inquiry":  "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." [Citations.]  The first inquiry . . . is distinctly factual . . . .  The second inquiry, however, calls for application of the controlling legal standard to the historical facts.  This ultimate determination . . . presents a "mixed question of law and fact" . . . .  [Citation.]

16

Accordingly, we apply a deferential substantial evidence standard [citation] to the trial court's conclusions regarding "'basic, primary, or historical facts: facts 'in the sense of recital of external events and the credibility of their narrators . . . .'"" [Citation.] Having determined the propriety of the court's findings under that standard, we independently decide whether 'a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.' [Citation.]" (*Id.* at pp. 401-402.)

We begin with the circumstances surrounding the interview. The interview lasted from 7:45 p.m. until 3:12 a.m. the following morning. Figueroa was questioned by two detectives; however, the detectives were not always in the room together, which means Figueroa was alone with a single detective at times. The detectives informed and thrice reminded Figueroa that the door to the room was unlocked.

We now turn to the next inquiry: given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. There are many relevant factors to consider when determining whether a person would have felt free to terminate the interrogation and leave.

The first factor concerns who initiated the contact; if it was the police, did the person voluntarily agree to the interview. (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162 (*Aguilera*).) The transcript of the interview reflects Figueroa voluntarily came to the sheriff's station to participate in the interview. The voluntary nature of the interview can be inferred from Cannon saying, "I appreciate you coming down to talk with us," and Figueroa explicitly agreeing to talk with the detectives.

17

The second factor addresses "whether the express purpose of the interview was to question the person as a witness or a suspect." (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.) It appears from the interview that detectives were unsure whether Figueroa was a witness or possible suspect. Cannon believed Figueroa at least saw the shooting, as evinced by Cannon accusing Figueroa of lying about his whereabouts on the night of the murder. As Figueroa slowly admitted being more involved in the crime, the detectives knew Figueroa was not merely a witness, i.e., Figueroa admitted giving Diaz the gun. However, it appears at the beginning of the interview, the purpose of the questions was to assess Figueroa's level of involvement as a witness or possible suspect.

The third factor concerns where the interview took place. (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.) The interview took place at a sheriff's station, in a room with a closed, but unlocked door. The fourth factor is "whether police informed the person that he or she was under arrest or in custody." The detectives informed and thrice reminded Figueroa that the door to the room was unlocked. When Cannon read Figueroa his *Miranda* rights, it can be inferred Figueroa was informed that he was in custody, although Cannon told Figueroa that he would not necessarily be going to jail.

The fifth factor is whether officers "informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom." (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.) As set forth *ante*, the detectives informed and reminded Figueroa three times that the door to the room was unlocked. During the first reminder, Cannon again asked Figueroa if he was still willing to talk with the detectives. Figueroa said he was willing.

18

During the third reminder, Figueroa told Johnson it did not matter if the door was unlocked because he believed he was going to jail or prison. Johnson responded, "No[,] you don't know that because like I said I don't know what you have to tell me." The detectives repeatedly told Figueroa the door was unlocked, asked if he was willing to continue talking, and informed him he was not in custody. Given these statements, the detectives informed Figueroa that he was free to leave because they repeatedly reminded Figueroa of the voluntary nature of the discussion.

The sixth factor addresses "whether there were restrictions on the person's freedom of movement during the interview." (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.) The door to the interview room was unlocked and in the midst of the interview, Johnson said, "If you need to use the restroom or something dude it's right out here on the (Inaudible)." Thus, it does not appear there were any restrictions on Figueroa's movement, since he was not locked in the room and was invited to leave the room to use the restroom.

The seventh factor concerns how long the interview lasted. (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.) The interview lasted from 7:45 p.m. until 3:12 a.m. the following morning, which is approximately seven and one-half hours. There was a break during the interview from 1:33 a.m. to 1:52 a.m. Figueroa ate a burrito during the break. The interview was somewhat long, lasting close to the length of an average person's eight-hour work day.

The eighth factor concerns how many law enforcement officers participated in the interview. (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.) Two detectives

19

participated in the interview; however, they were not always both present in the room. At times, only Figueroa and a single detective were present.

The ninth factor addresses whether officers "dominated and controlled the course of the interrogation." (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.) The detectives directed the majority of the discussion with their questions; however, they also stopped to address Figueroa's concerns. For example, Figueroa often expressed concern that he would be killed for being a "snitch." The detectives took time to discuss that concern with Figueroa, thus allowing Figueroa to direct portions of the conversation.

The tenth factor concerns whether officers "manifested a belief that the person was culpable and they had evidence to prove it." (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.) During the interview, Cannon said, "I've got evidence that clearly links you to this shooting." After the third reminder about the door to the room being unlocked, Figueroa told Johnson it did not matter if the door was unlocked because he believed he was going to jail or prison. Johnson responded, "No[,] you don't know that because like I said I don't know what you have to tell me. Thus, Cannon and Johnson contradicted one another about whether there was evidence clearly implicating Figueroa in a crime.

The eleventh factor concerns whether the officers were aggressive, confrontational, and/or accusatory. (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.) It appears from the inclusion of exclamation marks in the transcript that there was at least a moment where Cannon may have been exasperated. When Figueroa said he did not know how evidence from the shooting came to be in his house, Cannon responded, "You don't know!" At another point Cannon told Figueroa that he would have "bigger

problems" if he lied to the detectives than he would face from being viewed as a snitch by Westside Verdugo members.  However, the detectives mostly consoled Figueroa when he said he feared for his life due to talking to the detectives.

The twelfth factor is "whether the police used interrogation techniques to pressure the suspect." (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.)  During the interview, Figueroa agreed to participate in a polygraph examination.  During the post-polygraph examination, Cannon told Figueroa he had evidence implicating Figueroa as a participant in the shooting.  Cannon also told Figueroa deputies were serving a search warrant at Figueroa's house while the interview was taking place.  Thus, there were some interrogation techniques used to pressure Figueroa into being honest.

The thirteenth factor is, "whether the person was arrested at the end of the interrogation." (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.)  During the course of the interview, Cannon read Figueroa his *Miranda* rights.  Figueroa was not formally arrested during the interview, but he was arrested on July 14, which is the day the interview ended.  Thus, it can be inferred Figueroa was arrested shortly after the interview was completed.

Upon review of all the foregoing factors, we conclude a reasonable person would have felt he could terminate the interrogation and leave.  Of particular note in our conclusion is the fact that the detectives repeatedly reminded Figueroa that the door to the interview room was unlocked.  Figueroa appeared resigned to a fate of prison or death, and in this somewhat hopeless state chose not to leave, but the fact remains that a

21

reasonable person who was repeatedly reminded that the doors were unlocked would not have felt compelled to stay in the room with the detectives.

While our review of the various factors reflects a somewhat long interview with some interrogation techniques being used and an arrest following the interview, we come back to the fact that Figueroa was free to walk away from the interview—and was repeatedly reminded that he could do so. It is these reminders about the unlocked door and invitation to freely leave the room to use the restroom that would cause a reasonable person to conclude he could end the interview and leave if he so chose. Accordingly, we conclude the trial court properly denied Figueroa's motion because Figueroa was not in custody at the time he "pled the Fifth" or said he had "talked enough." Since Figueroa was not in custody, *Miranda* did not apply. (*People v. Ochoa*, *supra*, 19 Cal.4th at p. 401.)

Figueroa asserts a reasonable person would not have felt free to leave the interview because the detective woke Figueroa when he was falling asleep, the interview lasted for over seven hours, the detectives' questions were accusatory, and the detectives dominated the interview. We agree with Figueroa that the interview was somewhat lengthy and that Figueroa had to be woken up. However, the fact remains that Figueroa was repeatedly reminded the door was unlocked. The detectives were not screaming at Figueroa; they brought him food and tried to console him when he expressed fear of retribution. Thus, this is not a situation where the overbearing nature of the interrogation would cause a person to feel locked in the room despite the unlocked door. The detectives approached Figueroa in a reasonable manner and

22

repeatedly told him the door was unlocked. In that situation, a reasonable person would feel free to stop the interview and leave.

## ii. *Waiver*

Next, Figueroa asserts his *Miranda* waiver was involuntary because it was not knowingly made. "To establish a valid waiver of *Miranda* rights, the prosecution must show by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary. [Citations.] [¶] Determining the validity of a *Miranda* rights waiver requires 'an evaluation of the defendant's state of mind' [citation] and 'inquiry into all the circumstances surrounding the interrogation.'" (*People v. Nelson* (2012) 53 Cal.4th 367, 374-375.) "On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence. [Citation.]" (*People v. Williams* (2010) 49 Cal.4th 405, 425.)

As set forth *ante*, Figueroa willingly spoke to the detectives during a non-custodial interview. When Figueroa was read his *Miranda* rights, his version of the shooting was that he was present, but only because he "just happen[ed] to walk by at the wrong time." After being informed of his rights, Figueroa asked, "[D]oes that mean I'm go[ing] to jail?" Cannon replied, "No that doesn't mean that, that just means we want to hammer some things out."

Figueroa's comment about going to jail reflects that he understood the consequences of speaking to the detectives, i.e., he could be arrested. Cannon informed Figueroa that he was not yet going to jail, which is understandable since Figueroa said he was merely a bystander during the shooting. Thus, Figueroa knew he could

potentially go to jail if he continued talking to the detectives. Additionally, just prior to Figueroa being read his rights, the detectives and Figueroa took approximately a 20-minute break while Figueroa ate a burrito. Thus, Figueroa was not in the midst of being questioned when he waived his rights—he had been given a break and food. Given that there was a 20 minute break in the questioning, Figueroa was able to eat, and Figueroa appreciated the consequences of continuing to talk to the detectives (i.e., the potential of going to jail), it appears Figueroa's waiver was knowing and voluntary.

Figueroa asserts the detectives ignored his previous invocations of his *Miranda* rights (e.g., "I plead the Fifth"), woke him up when he was falling asleep, interviewed him for hours, accused him of participating in the crime, and denied that the *Miranda* warning meant Figueroa would be going to jail thus minimizing the significance of Figueroa waiving his rights. Figueroa paints the scene of a harsh interrogation. In reviewing the transcript, the interview is far more reasonable than presented by Figueroa. For example, if Figueroa was tired and wanted to sleep, he could have left. The detectives repeatedly reminded Figueroa the doors were unlocked. If Figueroa was uncomfortable with the detectives continuing to talk to him after he "pled the Fifth," then he could have left because the doors were unlocked. The interview was not as ruthless as Figueroa presents it. As a result, we find his argument to be unpersuasive.

### iii.    *Due Process*

Figueroa asserts all of his statements should have been suppressed because they were involuntary, and thus violated his rights of due process. "In determining whether a confession was voluntary, "'[t]he question is whether defendant's choice to confess was

24

not 'essentially free' because his [or her] will was overborne."' [Citation.] Whether the confession was voluntary depends upon the totality of the circumstances. [Citations.] "'On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review.'" [Citation.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 169.)

As set forth *ante*, the interview was approximately seven hours long and took place late at night. However, the door to the interview room was unlocked, the detectives reminded Figueroa the door was unlocked, and prior to Figueroa waiving his *Miranda* rights he was given a 20 minute break and food. Given these circumstances, we conclude Figueroa's decision to confess was voluntary because his will was not overborne by the circumstances of the interview. The interview may have felt long and tiresome, but it was not so harsh that Figueroa's will was overcome by the circumstances.

Figueroa asserts that he was 20 years old, taking medication for attention deficit hyperactivity disorder, and recently hospitalized due to being a danger to himself. Figueroa contends the detective "deceptive and coercive interrogation techniques" for multiple hours late at night caused Figueroa's will to be overcome, thus causing an involuntary confession. In looking at the facts concerning Figueroa, we look at the whole transcript. The transcript reflects Figueroa had been arrested four or five times for assault with a deadly weapon, public drunkenness, trespass, and theft. Figueroa told the detectives he had "just got outta West Valley [Detention Center]." Figueroa laughed

25

when discussing being "beat up" by members of the San Bernardino Police Department. Figueroa discussed prior times he spoke to the police, he said, "They sat down and talked to me, took a picture and then I had to tell 'em my side of the story." Figueroa explained that he lied to the police and blamed a prior crime on his cousins because he was "ashamed" of his actions. Given that Figueroa had experience being interviewed by law enforcement officers and choosing what details to be honest about, we are not persuaded by his argument that given his background his will would have been overcome by the circumstances of the interview.

### 2.  *ACCOMPLICE TESTIMONY*

Figueroa contends the trial court erred by not instructing the jury that Rojas's accomplice testimony should be viewed with caution. We disagree.

We apply the independent standard of review when considering alleged instructional errors. (*People v. Westbrooks* (2007) 151 Cal.App.4th 1500, 1506.) "'When an accomplice is called as a witness by the prosecution, the court must instruct the jurors sua sponte to distrust [her] testimony. [Citations.]'" (*People v. Guiuan* (1998) 18 Cal.4th 558, 564.)

"At common law, a person who encouraged or facilitated the commission of a crime could be held criminally liable for the crime he encouraged or facilitated, as well as for 'any other offense that was a "natural and probable consequence" of the crime aided and abetted.' [Citation.] The natural and probable consequences doctrine is based on the recognition that those who aid and abet should be responsible for the harm

26

they have naturally, probably, and foreseeably put in motion. [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 567; see also § 31.)

At trial, Rojas testified as a prosecution witness. The evidence reflects the victim pushed Rojas off her bicycle. Rojas "got back up, picked up her bike, and said, 'Oh, we'll see'" to the victim. Rojas rode away. Rojas rode her bicycle toward Figueroa, who at that point had been joined by Diaz. Rojas told Figueroa and Diaz about her encounter with the victim and pointed the victim out to Figueroa and Diaz. Figueroa said he wanted to fight the victim, but Rojas said the victim had a gun, so the group walked to Rojas's house where Figueroa retrieved his backpack. Rojas had seen a firearm and ammunition in Figueroa's backpack when he initially arrived at her house that day. The group then walked to Diaz's house, which was approximately 10 houses away, and a short while later Figueroa escorted Rojas back to her house, and Rojas stayed at home. That night, Rojas missed a telephone call from Diaz's mother's telephone. Rojas returned the call. Figueroa answered and said "[I]t's taken care of."

Detective Haynes testified as a defense witness. Haynes was present during the law enforcement interview of Rojas. During the interview, Rojas described the telephone call with Figueroa: Figueroa told Rojas, "'We handled it,'" and Rojas responded, "'What are you guys talking about?'" Rojas told Haynes she "wanted them 'to go heads up without the strap'"—a strap is a gun. During Diaz's law enforcement interview, he said he did not tell Rojas about his plan to kill the victim because he did not trust her. Diaz said, "I wasn't gonna tell [Rojas] 'cuz I know, it would of, if it would of break down like this, she would of, ya know, been, tell on me, ya know?"

27

The evidence supports the finding that Rojas wanted Figueroa and the victim to fight. Rojas spent time with Figueroa and Diaz prior to the murder, and Rojas knew Figueroa had a gun in his possession earlier in the day. The foregoing evidence does not reflect Rojas was a participant in the murder, knew about the murder, encouraged the murder, or encouraged a fight. The evidence reflects only what Rojas wanted and knew—Rojas wanted a fight to happen and she knew Figueroa had a gun. The record does not include evidence of Rojas actually encouraging the fight to take place. Rather, when Figueroa said he wanted to fight the victim, Rojas instructed him "not to" and they walked away. There is nothing after that reflecting Rojas told Figueroa and Diaz to attack the victim, and Diaz said he did not tell Rojas about his plans to kill the victim. Since the record is missing evidence of Rojas encouraging a fight to take place, and nothing indicates Rojas actually participated in the shooting, we conclude the trial court properly elected to not give the accomplice testimony instruction in relation to Rojas.

Figueroa asserts the accomplice testimony instruction should have been given in relation to Rojas because a juror could infer from the evidence that Rojas encouraged the killing. In his argument, Figueroa relies on Haynes's testimony about the law enforcement interview with Rojas. During the interview, Rojas was accused of participating in a conspiracy to murder the victim. While a law enforcement officer accused Rojas of participating in plans to murder the victim, the trial record remains devoid of any such evidence. Accordingly, we find Figueroa's argument to be unpersuasive.

28

### 3.    *CUMULATIVE ERROR*

Figueroa contends that if the errors were nonprejudicial when considered individually, the cumulative effect of the errors warrants reversal of the judgment. We have found no errors. Accordingly, we are not persuaded by Figueroa's cumulative error argument. (See *People v. Carter* (2005) 36 Cal.4th 1215, 1281 [no cumulative error where there is no individual error].)

### 4.    *GANG ENHANCEMENT SENTENCE*

Figueroa contends the trial court erred by imposing a 10-year sentence for the gang enhancement because the court should have imposed a minimum parole eligibility term. The People agree with Figueroa's argument. The gang enhancement statute typically requires a 10-year sentence for a violent felony. (§ 186.22, subd. (b)(1)(C).) However, if the felony is punishable by life imprisonment, then the sentence should reflect the defendant not be paroled for a minimum of 15 years. (§ 186.22, subd. (b)(5).) For the murder conviction, the trial court imposed a 25-years-to-life prison term. Since Figueroa received an indeterminate life term, the gang enhancement sentencing term should have reflected a minimum 15-year parole eligibility provision.[5] (*People v. Arauz* (2012) 210 Cal.App.4th 1394, 1404-1405.) We will strike the 10-year gang enhancement sentence and impose a 15-year minimum parole eligibility provision for the gang enhancement. (§ 186.22, subd. (b).)

---

[5] The 15-year minimum will be subsumed by the 25-year minimum for the murder; however, the 10-year prison term cannot be imposed. (*People v. Lopez* (2005) 34 Cal.4th 1002, 1011.)

5.      *CRUEL AND UNUSUAL PUNISHMENT*

Figueroa contends his mandatory 50-years-to-life sentence constitutes cruel and unusual punishment because it is effectively a sentence of life without parole imposed upon a person who was close to being a juvenile at the time the murder was committed.

The United States Supreme Court has held a mandatory life without parole sentence for a juvenile violates the Eighth Amendment—it must be a discretionary sentence. (*Miller v. Alabama* (2012) ___ U.S. ___ [132 S.Ct. 2455, 2464, 2471].) Figueroa was 20 years old on the day of the murder. Figueroa was not a juvenile. (Welf. & Inst. Code, § 101, subd. (b) [a child is person under 18 years old].) Since Figueroa was not a juvenile at the time of the murder, we conclude the mandatory 50-years-to-life sentence does not constitute cruel and unusual punishment.

Figueroa asserts he was similar to a juvenile because he was only 20 years old, attended a continuation high school, took medication for attention deficit hyperactivity disorder, and had been involuntarily hospitalized for being a danger to himself. This court cannot conduct a competency hearing. We can only consider the fact that Figueroa was 20 years old at the time of the murder, which means he was not a juvenile, and therefore the laws pertaining to juveniles are not applicable to him.

6.      *SECTION 12022.53, SUBDIVISION (C)*

While reviewing the record in this case, this court noticed (1) the minute order from the reading of the verdicts reflects the jury found true an allegation that Figueroa personally and intentionally discharged a firearm during the murder (§ 12022.53, subd. (c)); and (2) the trial court imposed and stayed a 20-year sentence for a section

30

12022.53, subdivision (c) firearm enhancement for Figueroa. However, (1) Figueroa was not charged with the section 12022.53, subdivision (c) enhancement; (2) there is not a verdict form reflecting this finding; and (3) the supposed jury finding does not appear in the reporter's transcript.

We asked the parties to submit supplemental briefing clarifying the record. Specifically, we asked the parties if Figueroa's jury made a true finding on a section 12022.53, subdivision (c) allegation. Figueroa asserts the jury did not make a true finding concerning section 12022.53, subdivision (c), and the true finding reflected in the minute order is a clerical error.

The People agree (1) the true jury finding is not in the reporter's transcript, and (2) there is not a verdict form for the finding. However, the People contend since the jury found true the allegation Figueroa vicariously discharged a firearm causing death (§ 12022.53, subd. (d)), the jury necessarily found true the implicit lesser included allegation that Figueroa vicariously discharged a firearm during the murder (§ 12022.53, subd. (c)). Thus, the People assert the trial court properly sentenced Figueroa for the section 12022.53, subdivision (c) enhancement, despite the lack of a jury finding.

The People's argument appears to set forth the following proposition: The clerk made a clerical error regarding the subdivision (c) true finding, but since subdivision (c) is a lesser included enhancement of subdivision (d), it was proper for the trial court to impose and stay the 20-year sentence. Rather than address the possible due process implications of sentencing a person for an enhancement that was never mentioned prior

31

to the judge imposing sentence, we will focus on the initial point—the clerk made a clerical error.

As set forth *ante*, (1) Figueroa was not charged with the section 12022.53, subdivision (c) enhancement; (2) there is a not a verdict form reflecting a true finding for the subdivision (c) enhancement; and (3) the finding does not appear in the reporter's transcript. Given the overall context in the record, we conclude the clerk's October 25, 2011, minute order contains an error regarding the true finding on the section 12022.53, subdivision (c) enhancement as it relates to Figueroa. (See *People v. Anzalone* (2013) 56 Cal.4th 545, 552, fn. 6.)

Since (1) the true finding was not made, and (2) Figueroa was sentenced for the "greater" enhancement (§ 12022.53, subd. (d)), we will strike the stayed 20-year sentence, and direct the trial court (1) to amend its minute order to reflect there was not a true finding concerning section 12022.53, subdivision (c) in Figueroa's case, and (2) to issue an amended abstract of judgment reflecting Figueroa does not have a 20-year sentence for the section 12022.53, subdivision (c) enhancement. Since the 20-year prison term was stayed, Figueroa's overall sentence of 50 years to life should remain unchanged.

B.    DIAZ

    1.    *MOTION TO SUPPRESS*

        a)    Procedural History

            i.    *Interview*

Diaz was 15 years old at the time of the murder.  On July 13 (the day after the murder) at 10:15 p.m. San Bernardino County Sheriff's Detectives Neal Rodriguez (Rodriguez) and Ryan Ford (Ford) interviewed Diaz.  At the beginning of the interview, Rodriguez read Diaz his *Miranda* rights.  Diaz agreed to talk with Rodriguez.  Diaz said he heard about the victim being killed.  The following exchange took place:

"Rodriguez:  [O]ne thing I want [to] make sure you're clear [about], you're not under arrest okay.

"Diaz:  Oh okay thanks.

"Rodriguez:  We're not taking you to jail or nothing like that. Um[.]

"Diaz:  Can I ask you a quick question.

"Rodriguez:  Sure.

"Diaz:  Why me like[?]

"Rodriguez:  Well we'll get to that in a minute.  Okay like I said we've talked to a lot of people.

"Diaz:  Okay."

Rodriguez told Diaz, "Somebody said you might know some information so we're here to talk to you."  Diaz said he spent the night of July 12 with a friend drinking beer and smoking.  Rodriguez asked why Rojas would have "throw[n] down [Diaz's]

33

name." Diaz denied knowing Rojas. Diaz said it had been approximately one month since he had seen Figueroa.

Rodriguez said he knew Diaz was present during the shooting because "everybody's story is the same." Diaz laughed and said, "[O]kay." Diaz denied he was present at the shooting. Diaz said he was not so "dumb" as to kill a person "around the block from [his] house." Rodriguez said there were "CSI people out there doing tracks and doing all kinds of stuff," so Diaz should not lie. Diaz said he was telling the truth and he "wasn't there." Rodriguez said, "I'm not gonna arrest you, I'm telling you, I, what did I tell you? [¶] .... [¶] I think that you were just there. [¶] ... [¶] [T]hat doesn't get you arrested for just being there."

Diaz refused to take a polygraph test. Rodriguez implored Diaz to "stop lying" about not being present at the shooting. Rodriguez then said, "You were a witness, you saw what happened that's why we need to talk to you. You're not, you're not under arrest." Diaz responded, "I know." Rodriguez asked, "So you're willing to go down for some other dude. That's what is gonna happen you're gonna be an accessory." Rodriguez explained Diaz would be an accessory because he was "there and [he was] not telling [the detectives] what happened."

Rodriguez gave Diaz chips to eat and then took a 10-minute break. After the break, Rodriguez moved the interview to an outdoor courtyard. Rodriguez said, "[M]aybe I got the facts wrong, maybe you are not [talking] to me because, maybe you were the shooter. Is that right, is that why you're hesitant to tell me what's going on[?] Rodriguez continued, "[T]his is not gonna go away okay. Um this, this incident that

34

happened, this murder that occurred will never go away okay." Diaz said he was telling the truth. Diaz asked if his mother knew he was at the sheriff's station. Rodriguez said he did not know, but he would call her when the interview ended. Diaz responded, "Can you do me that favor[?] [¶] . . . [¶] 'Cause I don't want her [to] be worried." After Diaz continued saying he was not present during the shooting, Rodriguez ended the interview, and they went back inside.

After Diaz sat in the holding area for awhile, Ford asked Diaz if he wanted to go outside to the courtyard area again. Diaz agreed. Ford asked Diaz if he intended "for what happened to happen." Diaz said, "'Yeah,'" and nodded his head yes. Eventually, Diaz invoked his right to remain silent. Ford said, "'Okay,'" and returned Diaz to the holding area. Diaz was being detained, but he had not been arrested. Rodriguez went home.

At some point after Diaz was returned to the holding area, Cannon arrested and booked Diaz. Cannon told Diaz he was being arrested for murder. Diaz appeared "shocked by it" and asked "why?" Cannon explained the detectives believed Diaz was responsible for the victim's death. Cannon did not discuss the facts of the case with Diaz because Cannon had been told Diaz invoked his right to remain silent. Diaz asked to speak to Rodriguez. A sergeant contacted Rodriguez at home.

At approximately 4:00 a.m., Rodriguez returned to the sheriff's station. Rodriguez read Diaz his *Miranda* rights again. Diaz said Figueroa shot the victim. Diaz thought Figueroa was robbing the victim, but then he killed the victim. Diaz said he decided to talk to Rodriguez because he did not want to "go down for something [he]

35

didn't do." Diaz volunteered to take a polygraph test. Rodriguez accused Diaz of lying about shooting. Diaz said he was telling the truth.

Diaz asked, "Well, right now, you say they, the other thing is that I'm lookin' at murder and that's what twenty-five to life?" Rodriguez said the prosecutor determined the charges, not the sheriff. Diaz again said Figueroa was the shooter. Rodriguez accused Diaz of lying. Diaz said, "I wanna make a deal with you, but I want you to make the deal with me, too." Diaz asked that he not be sentenced to life. Diaz said, "I'll do twenty five, but just not the L." Rodriguez said he could not make sentencing promises, but he would talk to the prosecutor.

Diaz responded, "Know what, man? Fuck it. I'll get locked down, kill myself in there, right, but check this out, this is what happened." Diaz again accused Figueroa of being the shooter. Diaz said he would show Rodriguez the house where they retrieved the gun if Rodriguez would take Diaz to his mother's house so he could give his mother a kiss. Diaz continued to accuse Figueroa of shooting the victim.

Rodriguez told Diaz he would perform a gunshot residue test on Diaz's hands because Rodriguez was "a hundred percent positive that [Diaz] shot this guy." Diaz asked to go outside. When they arrived outside, Diaz said, "I shot him." Diaz proceeded to tell Rodriguez how the shooting occurred. Rodriguez then went through the story again, confirming his understanding of the events and details surrounding the murder. Rodriguez asked Diaz if he felt sorry. Diaz asked, "What for?" Diaz asked, "You think I can use the phone right now? To call my mom? Maybe when we're done?" Rodriguez responded, "Yeah, when we're all done you can do that."

36

Rodriguez and Diaz took a break from 5:29 a.m. to 5:37 a.m. When the interview resumed, Rodriguez questioned Diaz about his tattoos and shotgun shells that were found in Diaz's house during a search. Diaz asked if Rodriguez would be taking him to jail. Rodriguez said he would. Diaz asked, "So, um, can my mom come and see me?" Rodriguez said she could likely visit him at juvenile hall. Rodriguez asked Diaz to take him to the house where the shotgun may have been hidden. Diaz asked if he could see his Mother during the trip. Diaz said, "Can't believe I did this all for a girl I don't even know like [*sic*], I don't even know like that, man."

ii.  *Motion*

Prior to trial, Diaz's trial attorney sought to suppress Diaz's statements to law enforcement officers, due to *Miranda* violations. Diaz's trial attorney argued, "You also notice, of course, as they always do, they make a big deal about how the guy is not in custody; he can leave whenever he wants; and then as soon as the interview is over and they don't get what they want in the interview, they place him under arrest for murder. [¶] I think it's clear that he was placed under arrest and told he was being arrested for murder is one more jolt to try to get him talking. It worked. It was after he invoked. So it doesn't matter what he said to Officer Rodriguez later that he sounded very cooperative. Once he invokes, he shouldn't have been pressured to retract that, um, assertion of his right."

The trial court found Diaz's statements were admissible and there was not a *Miranda* violation. The trial court explained, "[Diaz] requested the presence of Mr.

Rodriguez, that no pressure was applied.  Detective Rodriguez responded.  Mr. Diaz was advised of his *Miranda* rights, and the interview continued."

> b)    <u>Analysis</u>

Diaz contends the trial court erred by denying his suppression motion because his *Miranda* waiver during the second interview was involuntary.  We disagree.

"'"[I]f the accused indicates in any manner that he wishes to remain silent or to consult an attorney, interrogation must cease, and any statement obtained from him during interrogation thereafter may not be admitted against him at his trial" [citation], at least during the prosecution's case-in-chief [citations].'  [Citation.]  'Critically, however, a suspect can waive these rights.'  [Citation.]  To establish a valid waiver of *Miranda* rights, the prosecution must show by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary.  [Citations.]

"Determining the validity of a *Miranda* rights waiver requires 'an evaluation of the defendant's state of mind' [citation] and 'inquiry into all the circumstances surrounding the interrogation' [citation].  When a juvenile's waiver is at issue, consideration must be given to factors such as 'the juvenile's age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.'  [Citations.]" (*People v. Nelson*, *supra*, 53 Cal.4th at pp. 374-375.)

"Thus, for purposes of waiver determinations, courts must consider a juvenile's state of mind, as well as all other circumstances, including a request for a parent, in

order to ascertain whether the juvenile 'in fact knowingly and voluntarily decided to forgo' his or her *Miranda* rights. [Citation.] This approach allows the necessary flexibility for courts 'to take into account those special concerns that are present when young persons, often with limited experience and education and with immature judgment, are involved.' [Citation.]

"Finally, courts must use '"special care in scrutinizing the record"' to evaluate a claim that a juvenile's custodial confession was not voluntarily given. [Citation.] 'If counsel was not present for some permissible reason when [a juvenile's] admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.' [Citation.] Consequently, even when a juvenile has made a valid waiver of the *Miranda* rights, a court may consider whether the juvenile gave a confession after being '"exposed to any form of coercion, threats, or promises of any kind, [or] trickery or intimidation . . . ."' [Citation.] The constitutional safeguard of voluntariness ensures that any custodial admission flows from the volition of the juvenile, and not the will of the interrogating officers." (*People v. Nelson, supra,* 53 Cal.4th at pp. 379-380, fns. omitted.) "On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence. [Citation.]." (*People v. Williams*, *supra*, 49 Cal.4th at p. 425.)

Diaz was 15 years old at the time of the murder, and he had stopped attending high school. Diaz had never been arrested prior to this case. One of Diaz's older

brothers was incarcerated for shooting at gang members. Diaz's other older brother was murdered in Los Angeles. Rodriguez asked Diaz if he committed any crimes in Los Angeles. Diaz responded, "A lot. They killed my brother, what [do] you think?" Diaz said, "So, you know, like how they say you got to earn your tattoos." Diaz had multiple tattoos. It can be inferred Diaz has some knowledge of the criminal justice due to (1) his brother's case, and (2) his ability to avoid arrest despite having committed "a lot" of prior crimes.

Further, it appears Diaz understood the *Miranda* warnings given to him, since he invoked his right to remain silent and refused the polygraph test. When invoking his rights, Diaz told Ford, "'I'm just—remain silent.'" Ford said, "'Okay,'" and returned Diaz to the holding area. Additionally, it can be inferred that Diaz understood the consequences of waiving his rights, since he asked about the potential length of his prison term. Diaz asked, "Well, right now, you say they, the other thing is that I'm lookin' at murder and that's what twenty-five to life?"

In regard to requesting a parent, Diaz's requests for his mother were to (1) let her know his whereabouts so she did not worry, and (2) give her kiss. It does not appear Diaz requested his mother for the sake of protection or guidance. Additionally, Diaz said during the interview that if his mother were present, she would want him to tell Rodriguez the truth about what happened, so it appears Diaz's Mother would have encouraged him to waive his rights. Thus, Diaz's requests for his Mother do not reflect an unknowing juvenile requesting a parent's advice or protection.

As to Diaz's state of mind, Diaz was upset by the idea of potentially serving a life sentence, but felt no remorse for taking the victim's life. Diaz said he felt the victim "deserved it." Diaz's statements reflect self-concern and a desire for self-preservation. He did not appear distraught, depressed, or overly emotional. In sum, upon consideration of Diaz's age, experience, education, background, intelligence, knowledge of his rights, knowledge of the consequences of waiving his rights, his requests for parental contact, and his state of mind, it appears Diaz knowingly and voluntarily waived his rights.

Diaz contends the trial court erred by denying his suppression motion because his *Miranda* waiver during the second interview was involuntary due to detectives coercing Diaz into "choos[ing] between making a statement or being arrested." At the time Diaz was arrested he had already told Ford that he intended "what happened to happen." Thus, Diaz had already admitted a level of culpability. Diaz's admission could reasonably constitute probable cause for arrest. Thus, it does not appear the detectives concocted a ruse merely to coerce a confession from Diaz. Rather, the arrest was the logical result of Diaz's pre-arrest admission.

Moreover, after Diaz was arrested, he asked to speak with Rodriguez. Diaz had time to think about that decision while waiting for Rodriguez to leave his house and return to the sheriff's station. In other words, between deciding to waive his rights and actually talking to Rodriguez, Diaz had time to reconsider his waiver. Based upon this record, the detectives did not impose their wills onto Diaz. Diaz's admission flowed from his volition.

41

## 2. *CRUEL AND UNUSUAL PUNISHMENT*

### a) Procedural History

The trial court sentenced Diaz to a total prison term of 50 years to life. The court imposed 25 years to life for the first degree murder conviction (§ 187, subd. (a)) and a consecutive term of 25 years to life for discharging a firearm causing death (§ 12022.53, subd. (d)). The court imposed a concurrent 10-year prison term for the gang allegation (§ 186.22, subd. (b)). The court imposed and stayed (1) a 20-year prison term for discharging a firearm during the murder (§ 12022.53, subd. (c)), and (2) a 10-year prison term for using a firearm during the murder (§ 12022.53, subd. (b)). As set forth *ante*, Diaz was 15 years old at the time of the murder. Diaz was 17 years old at the time of the sentencing hearing.

### b) Analysis

#### i. *Contention*

Diaz contends the sentence of 50 years to life constitutes cruel and unusual punishment for three different reasons, which we will address in turn.

#### ii. *Forfeiture*

The People assert Diaz forfeited the cruel and unusual punishment issue for appellate review because he did not object at the trial court. Diaz contends the issue was not forfeited for failing to object because an objection would have been futile, in that a 50-years-to-life sentence was mandatory, i.e., the trial court had no other option. We agree with Diaz, an objection would have been futile in light of the mandatory sentencing requirements. Thus, we conclude the issue has not been forfeited. (See

*People v. Thompson* (2010) 49 Cal.4th 79, 130 ["a party may raise a claim on appeal despite the lack of an objection at trial where the circumstances show an objection would have been futile"].)

### iii.    *Background Law*

"Every person guilty of murder in the first degree shall be punished by death, imprisonment in the state prison for life without the possibility of parole, or imprisonment in the state prison for a term of 25 years to life." (§ 190, subd. (a).) The death penalty cannot be imposed on a juvenile offender. (§ 190.5, subd. (a).) An offender must be at least 16 years old to be eligible for life without parole. (§ 190.5, subd. (b).)

The firearm statute provides, "[A]ny person who, in the commission of a felony . . . personally and intentionally discharges a firearm and proximately causes . . . death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." (§ 12022.53, subd. (d).) The issues presented are purely legal, so we apply the de novo standard of review. (*In re Zepeda* (2006) 141 Cal.App.4th 1493, 1497.) The sentencing statutes in California require a 50-years-to-life sentence for a first degree murder wherein the defendant kills the victim with a firearm. (§§ 190, subd. (a), 12022.53, subd. (d).)

### iv.    *Retirement Age*

First, Diaz asserts his sentence is cruel and unusual punishment because it does not give him a realistic chance to reenter society. Diaz asserts that if he is granted parole at his first hearing, then he will be 65 years old, which is "approximately the

national retirement age," therefore making it unlikely Diaz could successfully begin building a life upon release.

"[S]entencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment.  Although [parole] authorities may later determine that [the offenders] should remain incarcerated for their natural lives, the state may not deprive them at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future." (*People v. Caballero* (2012) 55 Cal.4th 262, 268; see also *Graham v. Florida* (2010) 560 U.S. 48, 75.)

The *Caballero* opinion applies to non-homicide cases.  The high court noted there is a difference between non-homicide crimes and homicide.  The high court, citing the United States Supreme Court, wrote, "[N]onhomicide crimes differ from homicide crimes in a 'moral sense.'" (*People v. Caballero*, *supra*, 55 Cal.4th at p. 266.)  Since the instant case concerns a homicide we are not persuaded that the *Caballero* parole eligibility requirements apply, since *Caballero* explicitly applies only to nonhomicide offenders.

Moreover, if *Caballero* did apply, Diaz's parole eligibility date does not exceed his life expectancy.  Assuming Diaz must serve all 50 years before a parole hearing, then he would be 65 years old at the time of the hearing.  The average life expectancy of an American male is approximately 77 years old. (*People v. Romero* (2002) 99 Cal.App.4th 1418, 1427-1428.)  Thus, Diaz's parole eligibility date does not exceed his

44

natural life expectancy. As a result, we conclude the trial court did not err because there was no basis to ignore the statutory sentencing requirements since (1) Diaz was convicted of homicide, and (2) his parole eligibility date does not exceed his natural life expectancy.

v.     *Culpability*

Second, Diaz contends the sentence is disproportionate to his culpability given his background and crime. Diaz asserts his 50-years-to-life sentence is essentially a sentence of life without parole, since he will be 65 years at the time of his first parole hearing. Diaz contends this sentence does not comport with his culpability since "his father drank himself to death when Diaz was 11 [years old], Diaz's older brother was a gang member who was murdered[,] Diaz was recruited into a gang at approximately age 13[, and] Diaz was drunk at the time of the offense."

"The concept of proportionality is central to the Eighth Amendment. Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for [a] crime should be graduated and proportioned to [the] offense.' [Citation.]" (*Graham v. Florida*, *supra*, 560 U.S. at p. 59.) To determine if a sentence is unconstitutionally excessive the court must consider all the circumstances of the case. (*Ibid.*) A court begins the analysis by "comparing the gravity of the offense and the severity of the sentence." (*Id.* at p. 60.) In death penalty cases, a court considers (1) the nature of the offense, and (2) the characteristics of the offender. (*Id.* at pp. 60-61.) The characteristics of the offender are also relevant when imposing a sentence of life

45

without parole (LWOP) upon a juvenile offender. (*Miller v. Alabama*, *supra*, ___ U.S. ___ [132 S.Ct. at p. 2475].)

It does not appear that the offender's characteristics and background are relevant when a term of years sentence has been opposed; they are only relevant in death penalty cases and juvenile LWOP cases. In a term of years case, the relevant consideration for an allegation of cruel and unusual punishment is the nature of the crime compared to the sentence. Since Diaz was sentenced to a term of years, his personal characteristics are not relevant to determining if his sentence is cruel and unusual.

An additional problem with Diaz's argument is that the statutory sentencing requirements do not provide authority for the trial court to consider Diaz's characteristics in sentencing. The law requires a minimum 50-years-to-life term for the crimes Diaz committed. (§§ 190, subd. (a), 12022.53, subd. (d).) Therefore, any discussion about Diaz's characteristics would have been superfluous, since a lesser sentence could not be imposed.

In sum, under the current law, there is no relevance to discussing Diaz's personal characteristics, because (1) a discussion about cruel and unusual punishment does not take personal characteristics into account unless the sentence concerns (a) the death penalty, or (b) a juvenile sentenced to life without parole; and (2) there was a mandatory minimum sentence of 50 years to life so a mitigating factors analysis was moot.

Nevertheless, Diaz asserts his sentence is essentially an LWOP sentence disguised as a term of years, so we will continue. Before imposing an LWOP sentence upon a juvenile, a trial court must consider mitigating circumstances, the offender's

46

"age and age-related characteristics and the nature of their crimes." (*Miller v. Alabama*, *supra*, ___ U.S. ___ [132 S.Ct. at p. 2475].)

Diaz's father died when he was 11. Diaz's older brother was incarcerated for shooting gang members and his other older brother was killed, possibly by gang members. Diaz's mother moved the family from Los Angeles to Highland to stop Diaz's gang activity. However, Diaz continued his gang involvement by associating with members of Westside Verdugo. Diaz did not know the name of his victim and said he felt the victim "deserved" to die. Diaz waited until time had passed, when the victim was relaxed at his parents' house, to strike. The heat of the moment related to Rojas being pushed or punched had passed. Thus, Diaz, who had an opportunity to start over in a new location, became involved in gangs, and killed the victim, whom he did not know, in cold-blood.

Accordingly, while Diaz had some disadvantages in life, he also had advantages, such as an opportunity to start over and mother who tried to protect him from gang life. Thus, the mitigating factors are balanced by the advantages Diaz had. The murder Diaz committed was callous and ruthless. Given the balance of mitigating circumstances, Diaz's age, age-related characteristics, and the nature of his crimes, the sentence does not appear to be disproportionate to his culpability. As a result, the sentence does not constitute cruel and unusual punishment.

vi.    *Discretion*

Third, Diaz asserts the sentence is problematic because the trial court had no discretion to impose a lesser sentence. In particular, Diaz asserts the mandatory

47

consecutive 25-years-to-life sentence for the firearm enhancement (§ 12022.53, subd. (d)) is unconstitutional when applied to juvenile offenders because it effectively creates a mandatory LWOP sentence. Diaz asserts the trial court must have discretion regarding whether to impose the enhancement sentence upon a juvenile offender since the sentence is the functional equivalent of imposing an LWOP sentence.

The United States Supreme Court has held that a mandatory LWOP sentence for a juvenile violates the Eighth Amendment—it must be a discretionary sentence. (*Miller v. Alabama*, *supra*, ___ U.S. ___ [132 S.Ct. at pp. 2464, 2471].)

Diaz's sentence is not an LWOP sentence. If Diaz has to serve all 50 years of his term before his first parole hearing, then he will be 65 years old at the time of his first hearing. As set forth *ante*, the average life expectancy for an American male is approximately 77 years. Thus, Diaz should receive a parole hearing during his lifetime. As a result, Diaz was not given an LWOP sentence. We are not persuaded that the firearm enhancement sentence must be discretionary, since it does not result in an LWOP sentence.

3.     *GANG ENHANCEMENT SENTENCE*

Similar to Figueroa, Diaz contends the trial court erred by imposing and staying a 10-year sentence for the gang enhancement. (§ 186.22, subd. (b).) Diaz asserts he should have been given a minimum parole date of 15 years. The People agree with Diaz's argument. The gang enhancement statute typically requires a 10-year sentence for a violent felony. (§ 186.22, subd. (b)(1)(C).) However, if the felony is punishable by life imprisonment, then the sentence should reflect the defendant not be paroled for a

minimum of 15 years. (§ 186.22, subd. (b)(5).) For the murder conviction, the trial court imposed a 25-years-to-life prison term. Since Diaz received an indeterminate life term, the gang enhancement sentencing term should have reflected a minimum 15-year parole eligibility provision.[6] (*People v. Arauz*, *supra*, 210 Cal.App.4th at pp. 1404-1405.) We will strike the 10-year gang enhancement sentence and impose a 15-year minimum parole eligibility provision for the gang enhancement (§ 186.22, subd. (b)(5)).

## DISPOSITION

Figueroa's 10-year prison sentence for the gang enhancement (§ 186.22, subd. (b)) is stricken. A 15-year minimum parole eligibility date is imposed for the gang enhancement (§ 186.22, subd. (b)(5)).[7] The trial court is directed to amend its October 25, 2011, minute order to reflect there was not a true finding concerning section 12022.53, subdivision (c) in Figueroa's case. The 20-year stayed sentence for the section 12022.53, subdivision (c) enhancement is stricken. The trial court is directed to issue an amended abstract of judgment reflecting the sentencing changes. The trial court is directed to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation and any other appropriate agencies. In all other respects, the judgment is affirmed.

---

[6] The 15-year minimum will be subsumed by the 25-year minimum for the murder; however, the 10-year prison term cannot be imposed. (*People v. Lopez*, *supra*, 34 Cal.4th at p. 1011.)

[7] The minimum parole eligibility date currently in effect for Figueroa should remain unchanged as the 15-year date will be subsumed by the 25-year minimum for the murder.

Diaz's 10-year prison sentence for the gang enhancement (§ 186.22, subd.(b)) is stricken. A 15-year minimum parole eligibility date is imposed for the gang enhancement (§ 186.22, subd. (b)(5)).[8] The trial court is directed to issue an amended abstract of judgment reflecting the sentencing changes and to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation and any other appropriate agencies. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


MILLER
J.


We concur:

RAMIREZ
P. J.


CODRINGTON
J.

---

[8] The minimum parole eligibility date currently in effect for Diaz should remain unchanged as the 15-year date will be subsumed by the 25-year minimum for the murder.